ANTHONY M. BARNES (Bar No. 199048)
JASON R. FLANDERS (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
490 43rd Street, Suite 108
Oakland, CA 94609
Phone: (415) 326-3173

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>MCLANE FOODSERVICE, INC., a Texas corporation,<br><br>    Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.        JURISDICTION AND VENUE

1.        This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.        On February 10, 2020, CSPA issued a 60-day notice letter ("Notice Letter") to McLane Foodservice, Inc. ("Defendant" or "McLane"), for the industrial facility in Tracy, California under its control. The Notice Letter informed Defendant of its violations of California's General Permit for

Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ*) ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit"), recently amended but not yet adopted Order No. 20XX-XXX-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit"), and the Clean Water Act at McLane 's large-scale industrial fabrication and construction facility located at 800 E. Pescadero Avenue, Tracy, CA 95304 with Waste Discharger Identification Number (WDID) 5S39I020697("McLane Facility" or "Facility"). The Notice Letter informed Defendant of CSPA's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.      The Notice Letter was sent to Defendant's current President and Chief Executive Officer, William G. Rosier, registered agent for service of process, CT Corporation System, and the General Manager Dan Ball, as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. CSPA is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial

district.

## II.   **INTRODUCTION**

6.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

8.      Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a

substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

9.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the McLane  Facility.[1]

10.     CSPA specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.      PARTIES

### A.      California Sportfishing Protection Alliance

11.     CSPA is a California non-profit 501(c)(3) public benefit conservation and research organization with its principal place of business in Stockton, California. CSPA's organizational purpose is the protection, preservation, and enhancement of fisheries and associated aquatic and riparian ecosystems of California's waterways, including the greater Sacramento-San Joaquin River Delta ("Delta"), Sugar Cut, the Old River and Clifton Court Forebay the Receiving Waters herein. This mission is implemented through active participation in water rights and water quality processes, education and organization of the fishing community, restoration efforts, and vigorous enforcement of environmental laws enacted to protect fisheries, habitat and water quality. Members of CSPA use and enjoy California's numerous rivers, creeks and waterways, including Sugar Cut, the Old River and Clifton Court Forebay, for recreational and scientific activities such as viewing and enjoying wildlife, boating, fishing, birdwatching, golfing, engaging in scientific study to expand their understanding of various species and habitat health. CSPA's members derive significant and ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the waters of the greater Sacramento-San

---

[1] The Facility is fully described in Section V below.

Joaquin River Delta.

12.     CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including those in western San Joaquin County such as Clifton Court Forebay, Sugar Cut and the Old River. CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiates citizen enforcement. As referenced in above, members of CSPA use and enjoy the Receiving Waters herein into which Defendant have caused, are causing, and will continue to cause, pollutants to be discharged. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

13.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted stormwater and non-stormwater from the McLane Facility, negatively impacts and impairs CSPA's members' use and enjoyment of these waters.

14.     Continuing commission of the acts and omissions alleged herein will irreparably harm CSPA's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.     The Owners and/or Operators of the McLane Facility**

15.     CSPA is informed and believes, and thereon alleges, that McLane Company is headquartered at 800 E. Pescadero Avenue, Tracy, California.

16.     CSPA is informed and believes, and thereon alleges, that Defendant is the owner of the McLane Foodservice, Inc.

17.     CSPA is informed and believes, and thereon alleges, that Defendant is the operator of the McLane Facility

18.     CSPA refers to Defendant and its management herein as the "Owners/Operators" of the Facility.

19.     CSPA is informed and believes, and thereon alleges, that Defendant is an active California corporation registered in California.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

20.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

21.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

22.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

23.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

24.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

25.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

26.     The term "point source" means any "discernible, confined and discrete conveyance,

including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

27. "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

28. "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

29. The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

30. The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

31. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

32. A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

33. Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

34. The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water

1  Act, 33 U.S.C. § 1362(5).

2       35.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C.

3  § 1365(a).

4       36.    Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of

5  the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day;

6  violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects the

7  violator to a penalty of up to $53,484 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4

8  (Adjustment of Civil Monetary Penalties for Inflation).

9       37.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or

10  substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and

11  consultants' fees.

12      **B.**    **California's Storm Water Permit**

13       38.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own

14  EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges

15  of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b)

16  to regulate industrial storm water discharges through individual NPDES permits issued to dischargers

17  and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water

18  dischargers. *See id.*

19       39.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has

20  authorized California to issue NPDES permits, including general NPDES permits. California has

21  designated the State Board and the Regional Water Quality Control Boards to administer its NPDES

22  program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377,

23  1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect

24  California's water resources. *See* Cal. Water Code § 13001.

25       40.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board

26  pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of

27  the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit,

28  Section XXI(A).

41.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

42.     Under the applicable EPA regulations  all surface and ground waters of the State of California are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards unless a strict use attainability analysis is performed based upon a structured scientific assessment of the factors affecting the attainment of uses specified in Section 101(a)(2) of the Clean Water Act (the so called "fishable/swimmable" uses). 40 CFR 131.10(a) and (g).

43.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44.     On July 1, 2015 the 2015 Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id.* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

45.     On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 20XX-XXX-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit").

46.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water

Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

47.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

**C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

48.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

49.     Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

50.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National

Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52.     The EPA established Parameter Benchmark Values for the following parameters, among many others: total suspended solids ("TSS")—100 mg/L; oil & grease ("O&G")—15 mg/L; ammonia ("NH")—2.14 mg/L; aluminum ("Al")—.75 mg/l; chemical oxygen demand ("COD")—120 mg/L; iron ("Fe")—1 mg/l; copper ("Cu")—.0123 mg/l; zinc ("Zn")—.11 mg/L; pH—6-9 s.u.; and nitrate & nitrite nitrogen ("N+N")—0.68 mg/L. The Basin Plan's Water Quality Standards for the Central Valley Region requires a narrower pH range of 6.5—8.5 pH units. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

53.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

54.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges from adversely impacting human health or the environment.

55.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

56.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

57.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

58.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

59.     The State Water Quality Control Board has issued the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states the "All waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan, 3.1.20. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-1. The Basin Plan decrees that waters shall not contain chemical constituents, discoloration, substances or floating material in concentrations that cause nuisance or adversely affect beneficial uses *Id*. at 3.1

60.     The Basin Plan specifies existing beneficial uses for the Sacramento-San Joaquin Delta, including navigation, contact and non-contact recreation, commercial and sportfishing, estuarine habitat, wildlife habitat, rare, threatened, or endangered species habitat, migration of aquatic organisms, and spawning, reproduction and/or early development. Basin Plan, Table 2-1.

61.     The Water Quality Control Plan for the Sacramento River and San Joaquin River Basins also sets forth water quality standards and prohibitions applicable to McLane's storm water discharges. The Basin Plan identifies existing and potential Beneficial Uses for water bodies in the greater Sacramento-San Joaquin River Basin, which includes Sugar Cut, the Old River and Clifton Court Forebay, such as contact and non-contact water recreation, wildlife habitat, cold and warm freshwater habitat, spawning, and municipal supply, and also notes that beneficial uses vary throughout the Delta and are evaluated on a case by case basis. (Basin Plan, Table 2-1.)

62.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

63.     The Old River is listed for the following impairments on the 2016 303(d) list of impaired waterbodies: chlorpyrifos, low dissolved oxygen, electrical conductivity, and total dissolved solids. The Delta Waterways (export areas), the waters surrounding Clifton Court Forebay, are impaired for the

following constituents: toxicity, diazinon, DDT (dichlorodiphenyltrichloroethane), Group A pesticides, electrical conductivity, mercury, and chlorpyrifos.

64. In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

65. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

66. The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

67. Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

68. Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the Storm Water Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

**D.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

69. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

70.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

71.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

72.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential

pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

73.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id.*

74.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. 2015 Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year.[3] *Id.* at Section X(B)(3); 2015 Permit, Fact Sheet, Section II (I)(1).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

75.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The 2015 Permit updated the terminology to a Monitoring Implementation Plan ("MIP"). CSPA refers to the M&RP and MIP as "MIP" from here forward in this complaint. The MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized

---

[3] A reporting year under the Storm Water Permit is July 1 to June 30.

non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

76.     The objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

77.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id.*, 1997 Permit Section B(2)(c) and B(2)(d).

78.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

79.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

80.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of storm water discharges.

81.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

82.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

83.     Section B(5)(a) of the 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

84.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

85.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

86.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

87.     Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

88.     Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

89.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

90.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31),

1    and two (2) QSEs within the second half of each reporting year (January 1 to June 30). Dischargers are

2    required to submit the storm water sample analyses to the State Board and Regional Board.

3        91.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze storm water samples

4    for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that

5    serve as indicators of the presence of all industrial pollutants identified in the pollutant source

6    assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed

7    impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

8        92.    The McLane Facility's December 23, 2019, SWPPP requires testing for ammonia, pH,

9    TSS, O&G, and COD. Under the 2015 Permit, Facilities classified under SIC Code 4222 are required to

10   analyze storm water samples pH, TSS, and O&G.

11       93.    Section XVI of the 2015 Permit requires dischargers to submit an annual report with a

12   Compliance Checklist that indicates whether a Discharger complies with, and has addressed all

13   applicable requirements of the Storm Water Permit, an explanation for any non-compliance of

14   requirements within the reporting year, as indicated in the Compliance Checklist, an identification,

15   including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year,

16   and the date(s) of the Annual Evaluation.

17       94.    Section XII(C) of the 2015 Permit requires a discharger to execute a Level 1 Exceedance

18   Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a

19   Numeric Action Level ("NAL") for any required sampling and analysis parameter under the 2015

20   Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two

21   consecutive two consecutive reporting years, for any required sampling and analysis parameter under the

22   2015 Permit The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to

23   prevent future NAL exceedances and comply with the 2015 Permit. Based upon the ERA Evaluation(s),

24   the discharger shall as soon as practicable, but not later than January 1,  submit an ERA Report and

25   certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of

26   the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA

27   report requirements are more stringent than a Level 1 ERA report.

28

# V.        STATEMENT OF FACTS

### A.        McLane Foodservice, Inc. Facility Site Descriptions

95.     McLane operates an industrial facility located at 800 E. Pescadero Avenue, Tracy, California that consists of approximately 91 acres, with 22 acres exposed to storm water. The Facility's general purpose consists of refrigerated food intake, storage and transportation, including loading and unloading trucks with food and industrial equipment at the loading docks and other areas of the Facility. Other industrial operations are also pursued at the Facility, such as refrigeration and other industrial equipment repair and maintenance, vehicle repair and maintenance, fueling and washing of industrial equipment, storage of equipment, flammable materials, waste, and ammonia refrigeration units. The Facility engages large refrigeration and exhaust units directly adjacent the warehouse and on the warehouse roof. The McLane Facility operates Monday through Friday, 3:00 AM to 11:00 PM, excluding holidays, and Saturday from 8:00 AM to 4:30 PM.

96.     The McLane Facility's NOI and current SWPPP state that Defendant operates the Facility under Standard Industrial Classification ("SIC") Code 4222—Refrigerated Warehousing and Storage.

97.     Under SIC Code 4222, the Storm Water Permit requires McLane to analyze storm water samples at McLane Facility for TSS, pH, O&G. The Facility also samples for COD. Facilities must sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities pollutant source assessment, as required by the 2015 Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. 1997 Permit, Section B.5.c.i; 2015 Permit, Section XI.B.6.

98.     CSPA is informed and believes, and thereon alleges, that industrial activities at the Facility occur in the following industrial areas: the loading and unloading dock, warehouse, storage areas for pallets and other industrial materials, trailer and vehicle parking and storage areas, the trash compactor and general waste storage area, fueling and truck wash areas, the hazardous waste storage area, flammable materials storage area, and areas used for fueling and maintaining ammonia refrigeration units. There is also an office and an internal engine room with points of exhaust on the roof of the warehouse. Large exhaust units are mounted on the center section of the warehouse roof for heating and cooling units.

99.     CSPA is informed and believes, and thereon alleges that industrial activities at the Facility include vehicle washing, storage of frozen food in truck trailers and the warehouse, vehicle fueling, vehicle traffic, loading and unloading of foods and industrial materials to support industrial operations. Heavy forklift, truck, and other vehicle use occurs at the Facility and are likely leak oil and other fluids, and track pollutants on and off the industrial site. Ammonia and other hazardous materials are used routinely at the Facility and contribute to hazardous waste accumulation and storage at the Facility.

100.     CSPA is informed and believes, and thereon alleges that pollutant sources at the Facility include, oil and grease, diesel fuel, solvents, paints, suspended solids from traffic and sediment accumulation, batteries and electronic waste, pollutants from empty cannisters, and dust and debris from industrial activities.

**B.      The San Joaquin River and the Sacramento-San-Joaquin Delta**

101.     The greater Delta is California's most crucial water and ecological resource. This expansive inland river delta and estuary in Northern California is formed at the western edge of the Central Valley. The Delta is formed by the Sacramento River flowing south to meet the north-flowing San Joaquin River south of Sacramento, where the rivers mingle with smaller tributaries and tidal flows. Storm water from the McLane Facility flows to and contributes to the water storage export apparatus that distributes to the south in California.

102.     The greater Delta is home to over 500 plant and animal species including the critically endangered Delta Smelt, a species that has been listed as endangered under California Endangered Species Act since 2010. Including the Delta Smelt, the Delta is home to approximately 55 species of fish, including several Pacific salmon species, striped bass, steelhead trout, American shad, sturgeon, perch, and lampreys. About two-thirds of California's salmon pass through the Delta on their way upstream to spawn. Waterways in the Delta, such as the Old River, have suffered a history of pollution. Municipal and industrial runoff, along with pesticides and fertilizers have led to elevated levels of selenium, fluoride, nitrates and other substances in these waterways. In part due this pollution, there are many other threatened species and species of concern living in and the around the Delta.

C.      **The McLane Facility's Storm Water Permit Coverage**

103.    The Facility's NOI lists the Receiving Water as the City Channel, which empties into Sugar Cut, which flows to the Old River and Clifton Forebay, part to the greater Sacramento-San Joaquin River Delta. Sugar Cut, the Old River and Clifton Forebay are waters of the United States within the meaning of the CWA.

104.    The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number for the McLane Facility as 5S39I020697. SMARTS lists the Facility coverage under the Storm Water Permit as "Active."

105.    Via search of the SMARTS database, CSPA obtained a SWPPP for the Facility dated May 8, 2018 ("Facility SWPPP").

106.    CSPA is informed and believes, and thereon alleges, that the Facility's SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

107.    CSPA is informed and believes, and thereon alleges, that Facility's Owners/Operators did not sample storm water at all during the 2014-2015 reporting year, only sampled a single time during the 2015-2016 reporting year, and only sampled three times in the 2016-2017 reporting year despite ample storm events in each of those years. During the 2017-2018 and 2018-2019 reporting years, all storm water samples collected at the Facility were taken in 2018, though the Facility's annual reports note that all samples were collected in accordance with Section XI.B.5 of the 2015 Permit which requires two samples be taken in the first half of the reporting year. No samples for the Facility have been made publicly available for the 2019-2020 reporting year as the rainy season draws to a close, in violation of the 2015 Permit.

108.    CSPA is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: Cu, pH, TSS, O&G, COD, NH.

109.    CSPA is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the Facility in the SWPPP, the Owners/Operators have not developed and/or implemented all appropriate BMPs.

110.    CSPA is informed and believes, and thereon alleges, that the Facility SWPPP failed to

implement the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

111.    CSPA is informed and believes, and thereon alleges that McLane has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. 1997 Permit, Section A.8.b; 2015 Permit, Sections X.H.2.

112.    CSPA is informed and believes, and thereon alleges that there are no advanced BMPs implemented or planned for implementation, pursuant to the McLane Facility SWPPPs.

113.    CSPA is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least February 10, 2015.

114.    CSPA is informed and believes, and thereon alleges that violations of TSS, O&G and COD, among other constituents, occur each time storm water or non-storm water discharges from the Facility, in violation of the 1997 Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2, and 2015 Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

115.    CSPA is informed and believes, and thereon alleges that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

116.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of

1   practices.

2       117.    CSPA is informed and believes, and thereon alleges, that pollutants, including but not

3   limited to those referenced herein, have been and continue to be tracked throughout the Facility's

4   operation areas.

5       118.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' failure

6   to properly address pollutant sources and pollutants results in the exposure of pollutants associated with

7   its industrial activities to precipitation, and that this results in discharges of polluted storm water from

8   the Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

9       119.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' failure

10  to properly address these pollutants and its sources results in the exposure of pollutants to precipitation,

11  which carries these pollutants from the Facility directly into San Joaquin River and the Delta.

12      **D.    Storm Water Discharges from the McLane Facility**

13      120.    According to the McLane Facility SWPPP, the Facility identifies two discharge points.

14  The southern discharge point is said to carry only storm water from non-industrial areas and is thus not

15  sampled. Storm water from both discharge points flows into a drainage ditch, which connects to Sugar

16  Cut and then the Old River. The Old River flows to Clifton Court Forebay. Sugar Cut, the Old River and

17  Clifton Court Forebay are waters of the United States.

18      **E.    The McLane Facility's Storm Water Discharges to the Receiving Waters Contain
    Elevated Levels of Pollutants**

19
20      121.    CSPA is informed and believes, and thereon alleges, that pollutants from McLane

21  Facility discharge into Sugar Cut, the Old River and Clifton Court Forebay, traditionally navigable

    waters.

22      122.    The EPA promulgated regulations for the Section 402 NPDES permit program defining

23  waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to

24  include not only traditionally navigable waters but also other waters, including waters tributary to

25  navigable waters, wetlands adjacent to navigable waters, and other waters that could affect interstate

26  commerce. The CWA requires any person who discharges or proposes to discharge pollutants into

27  waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

28

123.   CSPA is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

124.   Storm water discharges containing pollutants, including but not limited to, COD, TSS, and O&G, adversely affect the aquatic environment.

125.   Samples of storm water discharges collected at Facility contain pollutants including TSS, O&G, and COD in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, and Benchmarks, in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

126.   CSPA is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] or any other storm water or non-storm water discharge that has occurred at the Facility since February 10, 2015, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

**F.   Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

127.   CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section B of the 1997 Permit, and Section XI of the 2015 Permit.

128.   CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2015 Permit.

129.   CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze any storm water samples at the Facility, in violation of Section B and Provision E(3) of the 1997 Permit and Section XI of the 2015 Permit.

130.   CSPA is informed and believes, and thereon alleges, that Defendant has failed and

---

[4] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

continues to fail to sample storm water discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

131.   CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

132.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the McLane Facility consistently fail to perform visual observations of storm water during QSEs.

133.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

134.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required.

135.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to collect storm water samples during QSEs.

136.   Information available to CSPA also suggests that the BMPs proffered as implemented in the Facility's SWPPPs are insufficient and ineffective in reducing pollutants to levels compliant with the CWA.

137.   CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators failed and continue to fail to submit adequate ERA Reports in recent reporting years to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the 2015 Permit.

138.   CSPA is informed and believes, and thereon alleges, that Defendant has failed to submit complete Annual Reports to the Regional Board for at least the last four Reporting Years in violation of Section B(14) of the 1997 Permit, and Section XVI of the 2015 Permit.

139. CSPA is informed and believes, and thereon alleges that Defendant failed to submit reports required by Receiving Water Limitations C(3) and (C)(4) of the 1997 Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
#### Discharges of Contaminated Storm water in Violation of
#### the Storm Water Permit's Effluent Limitations and the Clean Water Act.
#### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

140. CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

141. CSPA is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

142. CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

143. The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

144. CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

145. Each day since at least February 10, 2015 that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

146. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10,

2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

147.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

148.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

149.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

150.    CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

151.    CSPA is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of WQS has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

152.    The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

153.    CSPA is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

154.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

155.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

156.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

157.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

158.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

159.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

160.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

161.    CSPA is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

162.    The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from February 10, 2015 to the present.

163.    The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

164.    The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

165.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

166.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

168.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring and Reporting Plan in Violation of**
**the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

169.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

170.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water

Permit.

171.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

172.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

173.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from February 10, 2015 to the present.

174.    The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

175.    The Owners/Operators will continue to be in violation of Section B and Provision E(3) of the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

176.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

177.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

178.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

179.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FIFTH CAUSE OF ACTION**
**Defendant's Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

180.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

181.    CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to sufficiently sample and analyze storm water in violation of Section XI(B)(2) and (B)(6) of the 2015 Permit

182.    CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

183.    CSPA is informed and believes, and thereon alleges, that the Facility Owners/Operators failed and continue to fail to submit adequate ERA Reports to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the 2015 Permit.

184.    CSPA is informed and believes, and thereon alleges, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

185.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

186.    The Facility Owners/Operators have been in violation of Sections XI, XII and XVI of the 2015 Permit since July 1, 2015.

187.    The Facility Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit, and Sections XI, XII(C) and XVI of the 2015 Permit.

188.    The Owners/Operators have been in violation of Sections XI, XII(C) and XVI of the 2015 Permit since at July 1, 2015.

189.    The Owners'/Operators' violations of the reporting requirements of the 2015 Permit and the CWA are ongoing and continuous.

190.    By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 10, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

191.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

192.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.    A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.    A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. §

1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

        d.     A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015 and assessed on or after January 15, 2018 subjects McLane to a penalty of up to $53,484 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

        e.     A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

        f.     Any other relief as this Court may deem appropriate.

Dated: June 2, 2020                    Respectfully submitted,

                                      Anthony M. Barnes
                                      AQUA TERRA AERIS LAW GROUP
                                      Attorneys for Plaintiff CALIFORNIA
                                      SPORTFISHING